**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION**

| | |
|---|---|
| STEVEN R. SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 4:20-cv-00090-TWP-DML |
| | ) |
| CROUNSE CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Crounse Corporation ("Crounse") pursuant to Federal Rule of Civil Procedure 56. (Filing No. 33.) Plaintiff Steven R. Smith ("Smith") filed this lawsuit alleging violations of § 905(b) of the Longshore & Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, ("LHWCA"), general maritime law, and Indiana law, after he sustained injuries while working on a barge owned by Crounse. For the following reasons, the Court **grants** Crounse's Motion.

### I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Smith as the non-moving party. *See Zerante v. DeLuca*, 55 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Crounse owns barges and regularly delivers coal to power plants. (Filing No. 34 at 1.) After the coal has been unloaded, Crounse has an agreement with Mulzer Crushed Stone ("MCS") for MCS to clean Crounse's barge of the coal remnants, which MCS collects and later sells to third parties for profit. *Id.* Smith is employed by MCS and assists with the cleaning of the barges. *Id.*

On April 24, 2017, Smith was working for MCS, cleaning one of Crounse's barges that was docked at MCS's dock in Mauckport, Indiana. *Id.* at 2. The barge being cleaned was approximately 24 years old. (Filing No. 35 at 4.) Smith was operating a Bobcat skid steer to scoop up and move coal on the barge. (Filing No. 34 at 1.) Smith had regularly operated a skid steer for ten months prior to this date. (Filing No. 35 at 3.) While operating the Bobcat at around five to eight miles per hour, Smith struck a "scab" sticking up from the floor of the hopper. *Id.* at 2. The "scab" was a break in the floor where a weld had broken apart. The scab was located underneath leftover coal debris about a foot deep and was not visible when the skid steer struck it. (Filing No. 34 at 2.) Smith was the first MCS employee to approach the area where the scab was located. (Filing No. 35 at 2.)

When Smith's skid steer hit the scab, his seatbelt malfunctioned, throwing him into the safety bar. (Filing No. 34 at 3.) Immediately after the accident, Smith exited the skid steer and examined the hopper floor. (Filing No. 35 at 3.) He moved the coal debris away and located the scab, noticing it had markings around it. *Id.* MCS Operations Manager Jesse Peckinpaugh investigated the incident and emailed Crounse to tell them there was a 12-to-14-inch scab along the floor seam that MCS had bent back down to finish loading the barge and suggesting that Crounse "might want to get it on a maintenance list sometime." (Filing No. 34 at 3.) MCS did not report Smith's accident or injuries to Crounse. *Id.* Prior to his accident, Smith had never heard of a similar accident occurring nor had one ever been reported to Crounse. (Filing No. 34 at 5; Filing No. 35 at 3.)

After MCS completed their cleaning and loaded the barge with limestone, the barge transported the limestone approximately 550 miles upriver where it was unloaded on May 17, 2017. (Filing No. 34 at 3-4.) The barge was then reloaded and returned to Kentucky on June 7,

2017. *Id*. Later that same June, the barge underwent repairs for 15 feet of floor seam welds. (Filing No. 35 at 4.) In July, 270 inches of weld patches and 16 hole patches were additionally repaired on the barge. *Id*. Prior to these repairs, the barge had not been sent in for repairs since December 2015. *Id.*

On April 22, 2020, Smith filed this action, asserting claims for violations of § 905(b) of the LHWCA, general maritime law, and Indiana law related to injuries sustained in the accident. (Filing No. 1.) After completing discovery, Crounse filed their Motion for Summary Judgment on all claims. (Filing No. 33.)

## II.     LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). The moving party bears the burden of showing the absence of genuine issues of material fact. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). If the moving party carries its burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.

"However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.    DISCUSSION

The LHWCA established a comprehensive federal workers' compensation program that provides longshoremen and their families with medical, disability, and survivor benefits for work-related injuries and death. *See* 33 U.S.C. § 901 *et seq*. In *Scindia Steam Navigation Co., Ltd. v. De Los Santos*, 451 U.S. 156 (1981), the United States Supreme Court interpreted the extent of a vessel's liability under § 905(b) of the LHWCA.  The court explained that absent a contract provision, positive law, or custom to the contrary, the shipowner "has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop

4

within the confines of the cargo operation that are assigned to the stevedore[1]." *Scindia*, 451 U.S. at 172. However, the court did outline three duties of the shipowner.

First, the "turnover duty" requires that, prior to turning the ship over to a stevedore, the shipowner must "exercise ordinary care to have the ship and its equipment in a reasonably safe condition", and must warn of

> any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it, that would likely be encountered by the stevedore . . . and that are not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Elberg v. Mobil Oil Corp.*, 967 F.2d 1146, 1150 (7th Cir. 1992) (citing *Scindia*, 451 U.S. at 167) (internal quotation marks omitted). The second, the "active control duty," requires a shipowner to exercise due care to "avoid exposing longshoreman to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel." *Id.* The final one, the "duty to intervene," occurs when the shipowner has "actual knowledge of a dangerous condition which has arisen after the turning over of the ship to the stevedore." *Id*.

Crounse first argues that there is no evidence that it knew or should have known of the specific hazard before Smith's accident. Crounse asserts the hazard was obscured from the view of Crounse's deckhands by the coal remnants, and there is no evidence of what caused the weld to break or when the break occurred. (Filing No. 34 at 8.) Because of the lack of evidence as to when the break occurred, "the finder of fact would have to speculate . . . that the seam separated *and* that the edge of the flooring had somehow reached its raised position before the last prior inspection was performed." *Id.* (citing *Reed v. ULS Corp.*, 25 F. Supp. 2d 948, 949 (D. Minn. Mar. 26, 1998) (emphasis in original).

---

[1] A stevedore is a person employed, or a contractor engaged, at a dock to load and unload cargo from ships. https://vitul.lv/en/services/cargo-handling/

Second, Crounse argues that even if it had known about the condition on the flooring, all parties, including MCS and Smith, "knew this type of hazard could occur from time to time in the performance of the work." *Id.* According to Crounse, MCS should have anticipated and accounted for the surface condition in the performance of its cleaning the barge to its own satisfaction. *Id.* In support, Crounse contends that the condition of the floor separated during normal wear and tear of the floor panels. *Id.* As the contracted cleaner of the barge, it fell to MCS, through the work of its employees like Smith, to use care while removing the remaining coal and cleaning the barge. *Id.* at 8-9. As MCS chose to have Smith use a skid steer for this task, Crounse argues MCS should have taken care to ensure the vehicle was safe to operate "by inspecting the surface, securing the seatbelt and operating the vehicle at a safe speed." *Id.* at 9. Further, Crounse contends that the weld separating "likely happened during or after the last unloading of coal by a third party – or even during the course of cleaning by [MCS], as Smith began operating his Bobcat over the surface." *Id.* at 10. Under these circumstances, it cannot be responsible for risks and precautions inherent in the task MCS contractually agreed to perform.

Finally, Crounse argues that Smith admitted that it was the safety crossbar on the Bobcat that ultimately caused his injuries. *Id.* Whether the seatbelt of the Bobcat failed, Smith failed to secure it, or the speed caused the seatbelt to snap, Smith's accident was caused by factors that were not in Crounse's turnover duty under *Scindia*. *Id.* Crounse contends that it did not impose time demands on MCS or have any control over Smith's seatbelt. *Id.* at 11. Thus, it cannot be held liable under § 905(b).

In response, Smith argues that Crounse did have actual or constructive knowledge of the defect. Specifically, Smith asserts that the barge was delivered to MCS with the split seam defect existing from the outset because he struck it the first time he or any other MCS personnel were

6

near where the defect was located. (Filing No. 35 at 9-10.) Smith concludes that this is enough for the Court to be "able to determine precisely how and when the defect occurred." *Id.* at 10. Unlike the defect in *Reed* that did not occur until the end of the plaintiff's shift, Smith contends that the hazard in this case could not have developed until after turnover to MCS. *Id.*

Smith further argues that the split seam was only concealed because Crounse did not require its employees to inspect the hopper when it had coal debris in it. *Id.* Additionally, Crounse limited its employees' visual inspection of the barge to when they were walking on it, but not when the barge was moving. *Id.* Smith also contends that the alleged blade cleaning that occurred on April 1, 2017, which did not reveal any defect, "does not indicate that the hopper barge was cleaned sufficiently for an inspection . . . ." *Id.* Smith asserts that a broom cleaning would have allowed for a better inspection. *Id.* Further, Smith argues that the "fairly extensive repairs" that occurred a few months after the accident undermine Crounse's position that it had no knowledge of the defect. *Id.* According to Smith, Crounse considered the June and July 2017 repairs as "typical for a barge this age" and that when viewed in favor of the non-moving party, the inference that can be made is "the lack of clean inspections and the accumulated repair list is that defendant knowingly permits its barges to fall into a hazardous state of disrepair before taking them out of service for maintenance," thus constituting constructive notice. *Id.* at 11 (citing *Matthews v. Ernst Russ S.S. Co.*, 603 F.2d 676 (7th Cir. 1979). This conclusion can be drawn from the "poor maintenance record" of the barge. *Id.* at 13. Smith asserts that "[b]ecause [Crounse] . . . failed to carry out regular maintenance of the barge in question and failed to conduct regular, focused, dedicated, non-casual inspections, there is a genuine issue of material fact as to whether defendant should be charged with constructive knowledge . . . ." *Id.* at 14-15.

Smith also argues that Crounse had constructive knowledge based on Smith's testimony that the "split seam metal scab had markings on it that indicted it had been previously hammered into place". *Id.* at 15. Smith contends that Crounse admitted that its personnel "could" have hammered down the scab in an attempt at a temporary fix. *Id.* Smith asserts that this is at least a question of fact regarding whether Crounse complied with its turnover duty. *Id.*

Secondly, in response to Crounse's argument that Smith and MCS should have anticipated the defect, Smith argues that the contractual relationship between Crounse and MCS did not include inspecting the barge for hazards. *Id.* In particular, "the lapse between thorough cleanings, the lack of regular maintenance, the long list of defects that defendant permitted to accumulate before sending the barge for repairs, and the lack of any dedicated inspection regimen other than brief visual inspection by employees" indicates that Crounse had the opportunity, "other than when the barge had coal debris in it," to avoid hazards being provided to MCS. *Id.* at 16. Additionally, Crounse's reliance on *Conenna v. Loyal Chartering Corp.*, No. Civ. A. 98-7402 DGT, 2003 WL 255947, at *1 (E.D.N.Y. Feb. 5, 2003), is misplaced because it involves a cargo stow hazard rather than a vessel hazard and because the plaintiff admitted that the hazard was obvious. *Id.* at 16-17. Smith asserts that Crounse has testified that it finds many of these types of hazards, while Smith did not consider these types of issues common nor was he trained by MCS to encounter them. *Id.* at 18. Contrary to Crounse's argument, Smith contends that "[t]he stevedore is better placed to abate cargo hazards; the vessel owner is better placed to abate vessel hazards . . . ." *Id.* at 18-19 (citing *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92, 104-05 (1994)). As Smith puts it, "there is no reason for the plaintiff or his employer to have anticipated a rare hazard that is more similar to a floor collapsing for want of maintenance—which a stevedore should not anticipate." *Id.* at 19.

Finally, Smith contends that Crounse's argument regarding the ultimate cause of Smith's injuries is an issue of comparative negligence, and comparative negligence is not appropriate for a summary judgment motion. *Id.* at 20. Moreover,

> a longshoreman's award in a suit against a negligent shipowner is reduced by that portion of the damages assignable to the longshoreman's own negligence; but, as a matter of maritime tort law, the shipowner is responsible to the longshoreman in full for the remainder, even if the stevedore's negligence contributed to the injuries.

*Id.* (citing *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 260 (1979)). Smith contends that because there is evidence regarding Crounse's negligence in the record, summary judgment as to comparative fault is inappropriate. *Id.*

In reply, Crounse argues that the task of cleaning the barge and removing the remaining coal was specifically the job of MCS and, therefore, Smith. ([Filing No. 36 at 2](#).) Crounse contends that removing the coal was an inherent part of MCS's duties as stevedore, putting MCS in the best position to uncover the defect. *Id.* Crounse argues that there is no evidence that the defect occurred prior to the unloading by the Mill Creek steam plant. *Id.* at 3. Because the condition could only be discovered by removing the coal remnants, MCS was tasked with discovering the defect. *Id.* Crounse asserts that Smith is asking the Court to "re-allocate duties the parties assigned by agreement, which is inappropriate." *Id.*

As for Smith's argument that a broom cleaning should have been performed to allow the hazard to be discovered, Crounse argues that after the last broom cleaning, a "bladed" skid steer cleaning was successfully performed shortly before the accident. *Id.* at 3-4. According to Crounse, it was Smith who should have performed a broom cleaning before working on the floor or, in the alternative, operated his vehicle at a safe speed. *Id.* at 4. Relying on a Department of Labor regulation, Crounse argues that the stevedore is supposed to perform a preliminary visual inspection of the working surface. *Id.* (citing 29 C.F.R. § 1918.37). Crounse contends that

"according to regulation, industry practice, the parties' agreement and their course of performance, it is longshoremen and not seamen who go down in the hold and use brooms, vehicles and other equipment to unload and clean a barge at the dock." *Id.*

Crounse also replies that Smith attempts to hold Crounse strictly liable for using a 24-year-old barge that undergoes wear and tear in the normal course of use. *Id.* at 5. Crounse argues that the undisputed testimony shows that the industry lifespan of a barge is 40 years, while Crounse only runs its barges for 30 to 35 years. *Id.* According to Crounse, the defect was only 12 inches out of 25,000. *Id.* The repairs that occurred in the summer of 2017 "revealed only 450 inches of weld repaired, which was typical for a barge of this age; and there is no evidence of any additional <u>raised</u> obstructions of the type Smith encountered." *Id.* (emphasis in original). Crounse further asserts that MCS deemed the condition sufficiently ordinary "to simply bend the edge back into place and continue cleaning the barge and loading its own product for shipping and unloading by others." *Id.* Crounse contends that the law does not require it to ensure the stevedore's safety, supervise his work, or provide him with a workplace free of risk. *Id.* at 6. Crounse argues that it was

> entitled to assume that a competent stevedore would be familiar with typical conditions in a 24-year-old barge, and would employ mobile vehicles on such a working surface only after reasonable inspection, at safe speeds while employing safety restraints in good working order, taking care to carry on its cargo operation with reasonable safety to persons and property.

*Id.* at 6-7 (citing *Howlett*, 512 U.S. at 98).

Crounse next addresses Smith's argument that Crounse should have re-inspected the cargo stow for potential defects after its loading and unloading by prior stevedores. *Id.* at 7. Citing *Howlett*, Crounse argues that there is no evidence regarding when the flooring weld separated nor when it reached a position sufficient to interfere with the skid steer. *Id.* at 7-8. Crounse contends

10

that to have observed the condition prior to Smith's accident, it would have had to check the work of other stevedores. *Id.*at 8. Citing *Scindia* and *Howlett*, Crounse asserts that "it was not reasonably within the vessel owner's turnover duty to re-inspect this work surface after the Mill Creek transaction by removing the coal remnants". *Id.*

Finally, Crounse argues that any characterization or description made by Smith about the defect should be disregarded as opinion testimony. *Id.* Crounse argues that any description or suggestion as to the nature of the weld requires "engineering and metallurgical expertise," making Smith's testimony inadmissible under Federal Rule of Evidence 701(c). *Id.* Crounse also asserts that Smith's testimony does nothing to support that Crounse created or had knowledge of the condition. *Id.* at 9. Crounse contends that the condition also does not account for the damage Smith inflicted when he struck it. *Id.*

Smith's claim is limited to Crounse's alleged violation of its turnover duty under § 905(b) of the LHWCA. In addition to the delivering of the vessel in a safe condition, the turnover duty also requires a shipowner to

> warn the stevedore of any hazards on the ship or with respect to its equipment, so long as the hazards are known to the vessel or should be known to it in the exercise of reasonable care, and would likely be encountered by the stevedore in the course of his cargo operations, are not known by the stevedore, and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

*Howlett*, 512 U.S. at 98-99. Additionally, the turnover duty relates to the condition of the ship upon commencement of stevedoring operations, meaning that the breach must occur at or before the moment the vessel is turned over. *Id.* at 98.

The Court agrees with Crounse. Smith has provided no evidence that Crounse had actual knowledge of the defect at the time the barge was turned over, and the Court is not persuaded that Smith has created a triable issue that the defect should have been known to Crounse in the exercise

11

of reasonable care. Smith contends that Crounse had a "cavalier attitude" toward maintenance of the barge and attempts to conclude that additional or more consistent maintenance would have prevented the defect. While this may be Smith's opinion, he provides no evidence that more maintenance was required or recommended. Smith suggests that Crounse's employees should have conducted more thorough and regular inspections. But Smith once again supports his position solely with his personal opinion. Smith's opinions as to what Crounse should have done are not enough to create a genuine issue of material fact. *See Sink*, 900 F. Supp. at 1072 ("The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence.").

In further support of his position, Smith also points to repairs made to the barge during June and July 2017, arguing that it indicated Crounse "allowed a certain amount of damage to accumulate on the barge before taking it out of service for repairs." ([Filing No. 35 at 13](#).) But repairs that occur several months after Smith's accident do nothing to support Smith's position other than ask a factfinder to speculate that these repairs existed in April 2017 and Crounse knew about them. In fact, the record before the Court includes evidence that the barge continued to be used during May and June 2017 for transporting products without any issues being reported. ([Filing No. 34 at 4](#).) Likewise, Smith's own testimony regarding the split seam is unpersuasive. While Smith would be entitled to testify as to what he saw, his statements regarding whether the tears or breaks were "fresh" or whether they had been previously repaired by being hammered down are inadmissible for the purposes of summary judgment. *See U.S. v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) (quoting *U.S. v. Santos*, 201 F.3d 953, 963 (7th Cir. 2000)) ("Inferences [to be admissible as lay testimony] must be tethered to perception, to what the witness saw or heard.")

Viewing the record before the Court, the evidence designated would not permit a reasonable factfinder to conclude that Crounse violated its turnover duty.

Based upon the foregoing analysis, the Court finds that there is no genuine issue of material fact. The Court **grants** summary judgment in favor of Crounse.

### IV.     CONCLUSION

For the reasons discussed above, Defendant Crounse Corporation's Motion for Summary Judgment ([Filing No. 33](#)) is **GRANTED**. Final judgment will issue under separate order.

**SO ORDERED**.

Date: 1/27/2022

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Isaac H. Soileau, Jr.
SOILEAU & ASSOCIATES LLC
ihs.soileaulegal@gmail.com

Marsha A. Dailey
KARL TRUMAN LAW OFFICE, LLC
marshadailey@trumanlaw.com

Ryan A. Jurkovic
SOILEAU & ASSOCIATES, LLC
rjurkovic@soileaulegal.com

C. Thomas Miller
WHITLOW, ROBERTS, HOUSTON & STRAUB PLLC
tmiller@whitlow-law.com